ORAL ARGUMENT NOT YET SCHEDULED

No. 22-1333

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Secretary of Labor,
Mine Safety and Health Administration,

Petitioner

*v.*

Peabody Midwest Mining, LLC and
Federal Mine Safety and Health Review Commission,

Respondents

On Petition for Review of a Decision of the
Federal Mine Safety and Health Review Commission

Brief for the Secretary of Labor

SEEMA NANDA
  Solicitor of Labor

APRIL E. NELSON
  Associate Solicitor

EMILY TOLER SCOTT
  Counsel for Appellate Litigation

ALEXANDRA J. GILEWICZ
  Attorney
  U.S. Department of Labor
  Office of the Solicitor
  Division of Mine Safety and Health
  201 12th Street South, Suite 401
  Arlington, VA 22202
  (202) 693-5414

## Certificate as to Parties, Rulings, and Related Cases

Under the D.C. Circuit Court Rule 28(a)(1)(A), the Secretary of Labor certifies:

### 1. Parties

The following parties participated in the underlying proceeding before the Federal Mine Safety and Health Review Commission, LAKE 2017-0450:

- Peabody Midwest Mining, LLC

- Federal Mine Safety and Health Review Commission

- Secretary of Labor, Mine Safety and Health Administration

Petitioner in this case is the Secretary of Labor. Respondents are Peabody Midwest Mining, LLC and the Federal Mine Safety and Health Review Commission. There are no amici curiae.

### 2. Rulings Under Review

The ruling under review is the June 2, 2020 final order of the Federal Mine Safety and Health Review Commission in *Peabody Midwest Mining, LLC*, No. LAKE 2017-0450. The decision is reported at *Peabody Midwest Mining, LLC*, 42 FMSHRC 379 (June 2020).

### 3. Related Cases

This case has not previously been before this Court. The Secretary of Labor is not aware of any related cases currently pending in this Court or any other.

## Table of Contents

Jurisdictional Statement ..................................................................... 1

Introduction and Statement of the Issues ........................................... 1

Statement of the Case ........................................................................ 4

    1.  Statutory and regulatory framework ........................................ 4

        a.  Significant and substantial violations ............................... 5

        b.  Emergency standards ....................................................... 8

        c.  Emergency response plans and refuge alternatives .......... 9

    2.  Factual background ................................................................ 12

        a.  The ALJ's decision ........................................................ 14

        b.  The Commission's decision ............................................ 15

Summary of Argument ...................................................................... 18

Standing ........................................................................................... 21

Argument .......................................................................................... 21

    1.  Standard of review ................................................................. 21

    2.  The Commission did not assume the contemplated emergency. ................. 23

        a.  The contemplated emergency in this case is an explosion at the working face that necessitates use of the refuge chamber that was placed in direct line of sight of the working face. ..................................... 23

        b.  By requiring proof of an ignition source during shift change—i.e., when two refuges would be needed—the Commission failed to assume the contemplated emergency. ...................................... 29

    3.  The plain meaning of "significant and substantial" requires the Secretary to prove, at step two of the *Mathies* test, only that a violation *could contribute to* a discrete hazard that is more than remote or speculative—not that a violation is *reasonably likely* to cause the occurrence of the discrete hazard. ................................ 35

        a.  Statutory text & structure .............................................. 36

        b.  Legislative history ......................................................... 40

    c.  Courts of appeals' interpretations............................................. 44

    d.  Protective purpose ............................................................. 45

    e.  The Commission's changes to step two since *Newtown* are an unacknowledged and unjustified departure from precedent. .................... 47

    f.  If the Court concludes that the Mine Act is ambiguous as to whether a violation must be reasonably likely to cause a hazard, the Secretary's interpretation is owed deference. ..................................... 49

  4.  The evidence compels the conclusion that the violation was S&S, and the unwarrantable failure designation must be reinstated as a matter of law. ......................................................... 50

Conclusion ......................................................................... 53

Certificate of Compliance with Type-Volume Limit,  Typeface Requirements, and Type-Style Requirements .......................................................... a

Certificate of Service ................................................................ b

Addendum – Pertinent Statutes and Regulations...................................... c

# Table of Authorities

Page(s)

**Cases**

*Alabama By-Products Corp.*,
   7 IBMA 85 (1976) ............................................................. 41

*Am. Coal Co.* v. *FMSHRC*,
   796 F.3d 18 (D.C. Cir. 2015) .......................................... 22, 46

*Barbour* v. *Browner*,
   181 F.3d 1342 (D.C. Cir. 1999) ...........................................22

*CalPortland Co., Inc.* v. *FMSHRC*,
   839 F.3d 1153 (D.C. Cir. 2016) ................................ 35, 36, 37

*Consolidation Coal Co.* v. *FMSHRC*,
   824 F.2d 1071 (D.C. Cir. 1987) ....................................... 42, 43

*Cumberland Coal Res., LP* v. *FMSHRC*,
   717 F.3d 1020 (D.C. Cir. 2013) ..................... 7, 8, 9, 18, 21, 23, 24, 25, 28

*Donovan ex rel. Anderson* v. *Stafford Constr. Co.*,
   732 F.2d 954 (D.C. Cir. 1984) .............................................. 51

*Eastern Assoc. Coal Corp.*,
   3 IBMA 331 (1974) ........................................................... 41

*Int'l Union, United Mine Workers* v. *MSHA*,
   823 F.2d 608 (D.C. Cir. 1987) .............................................. 46

*Knox Creek Coal Corp.* v. *Sec'y of Lab.*,
   811 F.3d 148 (4th Cir. 2016) ....................................... 7, 44, 45, 48

*Lone Mountain Processing, Inc.* v. *Sec'y of Lab.*,
   709 F.3d 1161 (D.C. Cir. 2013) ........................................ 47, 49

iv

*Peabody Midwest Mining, LLC* v. *FMSHRC*,
  762 F.3d 611 (7th Cir. 2014) ................................................................. 8, 44

*Petit* v. *U.S. Dep't of Educ.*,
  675 F.3d 769 (D.C. Cir. 2012) ......................................................... 36

*Pullman-Standard* v. *Swint*,
  456 U.S. 273 (1982) ....................................................................... 22, 23

*RAG Cumberland Res. LP* v. *FMSHRC*,
  272 F.3d 590 (D.C. Cir. 2001) ....................................................... 6, 22

*Russello* v. *U.S.*,
  464 U.S. 16 (1983) ........................................................................... 37

*Sec'y of Lab.* v. *Cannelton Indus., Inc.*,
  867 F.2d 1432 (D.C. Cir. 1989) ..................................................... 22

*Sec'y of Lab.* v. *Consolidation Coal Co.*,
  895 F.3d 113 (D.C. Cir. 2018) .................................................... 7, 50

*Sec'y of Lab.* v. *Excel Mining, LLC*,
  334 F.3d 1 (D.C. Cir. 2003) ........................................................... 22

*Sec'y of Lab.* v. *FMSHRC*,
  111 F.3d 913 (D.C. Cir. 1997) ......................................... 15, 39, 42, 53

*Sec'y of Lab.* v. *Nat'l Cement Co. of Cal.*,
  573 F.3d 788 (D.C. Cir. 2009) ....................................................... 21

*Sec'y of Lab.* v. *Twentymile Coal Co.*,
  456 F.3d 151 (D.C. Cir. 2006) ....................................................... 21

*Sec'y of Lab.* v. *Westfall Aggregate & Materials, Inc.*,
  64 F.4th 315 (D.C. Cir. 2023) ....................................................... 49

*Thunder Basin Coal Co.* v. *Reich*,
  510 U.S. 200 (1994) ................................................................... 36

*United Mine Workers of Am.* v. *Dep't of Interior*,
  562 F.2d 1260 (D.C. Cir. 1977) .................................................. 50

*Village of Barrington, Ill.* v. *Surface Transp. Bd.*,
  636 F.3d 650 (D.C. Cir. 2011) .................................................... 37

*Wolf Run Mining Co.* v. *FMSHRC*,
  659 F.3d 1197 (D.C. Cir. 2011) .................................................. 36

*Yellow Taxi Co. of Minneapolis* v. *NLRB*,
  721 F.2d 366 (D.C. Cir. 1983) .................................................... 49

*Ziegler Coal Co.* v. *Kleppe*,
  536 F.2d 398 (D.C. Cir. 1976) .................................................... 41

**Federal Mine Safety and Health Review Commission Decisions**

*Cement Div., Nat'l Gypsum Co.*,
  3 FMSHRC 822 (1981) .................................................................. 6

*Cumberland Coal Res., LP*,
  33 FMSHRC 2357 (2011) .............................................................. 9

*ICG Illinois LLC*,
  38 FMSHRC 2473 (2016) ...................................... 23, 25, 27, 32, 33, 34

*Mathies Coal Co.*,
  6 FMSHRC 1 (1984) ...................................................................... 7

*Musser Eng'g, Inc.*,
  32 FMSHRC 1257 (2010) .......................................................... 8, 47

*Newtown Energy, Inc.*
  38 FMSHRC 2033 (2016) ....................................................... 8, 47, 48

*Oak Grove Res., Inc.*,
  37 FMSHRC 2687 (2015) .................................................................. 47

*Spartan Mining Co.*,
  35 FMSHRC 3505 (2013) ............................................23, 24, 32, 34

**Statutes**

30 U.S.C. 801 ...................................................................................... 4

30 U.S.C. 802(j) .............................................................................19, 37

30 U.S.C. 811(a) .................................................................................. 4

30 U.S.C. 813 ...................................................................................... 5

30 U.S.C. 814 ...................................................................................... 5

30 U.S.C. 814(c)(1) (1976) ................................................................. 40

30 U.S.C. 814(d) ........................................................5, 6, 41, 45

30 U.S.C. 814(d)(1) ....................................................................... 14, 42

30 U.S.C. 814(e) .......................................................................... 5, 46

30 U.S.C. 815(d) .................................................................................. 1

30 U.S.C. 816(b) ..........................................................................1, 21

30 U.S.C. 817(a) ................................................................................ 37

30 U.S.C. 823(d) ..................................................................................5

30 U.S.C. 876 ...........................................................................11, 26

30 U.S.C. 876(b)(2)(B) ...............................................................11, 26

**Rules**

D.C. Cir. R. 28(a)(7) ................................................. 21

**Regulations**

30 C.F.R. 75.1506 .....................................................11

30 C.F.R. 75.1506(b)(2) ........................................11, 26

30 C.F.R. 75.1506(c)(1) ...............................................11

30 C.F.R. 75.1507 .....................................................11

30 C.F.R. 75.1507(a)(11)(i) ...................................12, 26

30 C.F.R. 75.1507(d) ................................................ 28

*Refuge Alternatives for Underground Coal Mines,*
  73 Fed. Reg. 34140 (June 16, 2008) ................... 10, 12

*Refuge Alternatives for Underground Coal Mines,*
  73 Fed. Reg. 80656 (Dec. 31, 2008)..................11, 27

*The "Significant and Substantial" Phrase in Sections 104(d) and (e) of the Federal Mine Safety and Health Act of 1977: Interpretive Bulletin,*
  63 Fed. Reg. 6012 (Feb. 5, 1998) ......................... 43

**Other Authorities**

S.Rep. No. 95-181 .................................... 20, 41, 42, 43

S. Rep. No. 109-365..................................................11

Webster's Third New International Dictionary (1961) ......................................... 36

The American Heritage Dictionary of the English Language (1969) .................... 37

The American Heritage Dictionary of the English Language
  (4th ed. 2000) ............................................................................ 37

U.S. Dep't of Lab., MSHA, Report of Investigation on the
  Sago Mine Disaster (May 9, 2007)................................................10, 31

U.S. Dep't of Lab., MSHA, Report of Investigation on the
  Aracoma Coal Mine Fire (2007) ...................................................... 10

U.S. Dep't of Lab., MSHA, Report of Investigation on the
  Darby Mine Disaster (Apr. 12, 2007) ................................................ 10

U.S. Dep't of Lab., MSHA, Report of Investigation on the
  July 3, 1983 Homer City Mine Explosions ........................................... 31

U.S. Dep't of Lab., MSHA, Report of Investigation on the
  Willow Creek Mine Explosions .......................................................... 32

U.S. Dep't of Lab., MSHA, Report of Investigation on the
  Jim Walter Resources No. 5 Mine Disaster (Dec. 11, 2002) ............................ 32

U.S. Dep't of Lab., MSHA, Report of Investigation on the
  Day Branch Mine Accident (May 26, 1995) ........................................... 32

U.S. Dep't of Lab., MSHA, Report of Investigation on the
  Elmo #5 Mine Explosion (Jan. 4, 1995) .............................................. 32

## Glossary of Terms

| | |
|---|---|
| ALJ | Administrative Law Judge |
| JA | Citations to the Joint Appendix |
| Mine Act | Federal Mine Safety and Health Act of 1977 |
| MSHA | Mine Safety and Health Administration |
| S&S | Significant and Substantial |

## Jurisdictional Statement

The Federal Mine Safety and Health Review Commission had jurisdiction over this case because Peabody Midwest Mining, LLC timely contested the citation it received from the Mine Safety and Health Administration. 30 U.S.C. 815(d), 823(d).

The Commission ALJ issued a decision on June 28, 2018. Peabody filed a timely petition for discretionary review, which the Commission granted; the Commission issued its decision on June 2, 2020. That decision remanded the case to the ALJ, who issued a decision on remand on August 12, 2020. The Secretary filed a timely petition for discretionary review, which the Commission granted on September 17, 2020. Then, on November 28, 2022, the Commission vacated the direction for review; the ALJ's decision on remand became a final Commission order that day. The Secretary filed a petition for review with this court on December 27, 2022, within 30 days of the final Commission order, as required by the Federal Mine Safety and Health Act of 1977. 30 U.S.C. 816(b). This Court has jurisdiction under section 106(b) of the Mine Act. *Ibid.*

## Introduction and Statement of the Issues

Mine safety laws are said to be written with the blood of miners. This is because mining is an inherently dangerous profession. Those dangers are

1

unpredictable; it can be hard to determine when the roof of an underground coal mine will collapse, whether methane will ignite, or the rate at which fire will spread. Yet every day, miners face these potential hazards when they enter underground coal mines to do their jobs.

The Mine Safety and Health Administration has promulgated safety and health regulations and standards aimed at reducing these risks. Some of these standards are "emergency standards," or standards that protect against hazards that arise after a mine emergency has already occurred. And the Mine Act grants the Secretary elevated enforcement tools that she may use when mine operators violate emergency and other standards. The authority to designate a citation as "significant and substantial," or S&S, is the central tool that serves as the basis for several of these elevated enforcement schemes under the Mine Act. This case is about the Secretary's ability to enforce these standards and use these tools—and to do so as the Mine Act requires.

In this case, a divided Federal Mine Safety and Health Review Commission determined that the Secretary did not prove that a violation of an emergency standard was S&S. The emergency standard at issue prohibits the placement of refuge chambers—underground structures meant to shield miners and keep them alive in the event of a mine emergency that makes evacuation impossible—in direct

2

line of sight of the working face of the mine. This is because an explosion at the working face (where active mining is occurring) could destroy the refuge chamber and render it unusable, leaving miners without refuge in the event of a mine disaster. In July 2017, during an inspection of Peabody's Francisco Underground Pit, an MSHA inspector saw a refuge chamber that was placed in direct line of sight of the working face. He cited Peabody, and designated this violation S&S and as an unwarrantable failure to comply with the standard. After a hearing, the administrative law judge affirmed, but on review, the Commission majority removed the S&S designation (and, as a matter of law, the unwarrantable designation).

But the Commission made two legal errors. First, in determining that the violation was not significant and substantial, it failed to assume the emergency contemplated by the standard. This flouts the Commission's own precedent and that of this court. Second, it erred by requiring the Secretary to prove that a violation was *reasonably likely to cause the occurrence of* a discrete safety hazard in order to prove that the violation was S&S. This position is inconsistent with the plain meaning of the S&S provision in the Mine Act, which requires the Secretary to prove that a violation *could* contribute to a discrete hazard.

The Commission claimed it was acting in accordance with its own precedent and that of the federal courts of appeals. But, in reality, the Commission misinterpreted, misapplied, and disregarded precedent. Its decision also ignores the legislative history of the Mine Act and its promulgated standards. And if left to stand, these errors will severely curtail the Secretary's ability to enforce the Mine Act.

1. Did the Commission err when it failed to assume the occurrence of the contemplated emergency—an emergency that necessitates the use of the refuge chamber that was placed in direct line of sight of the working face?

2. Is the Commission's "reasonably likely to cause the occurrence of" test for S&S violations inconsistent with the Mine Act?

3. Assuming the occurrence of this contemplated emergency and applying the "could contribute to" S&S test, does the evidence compel the conclusion that this violation was S&S? If so, must the unwarrantable failure designation be reinstated, since Peabody did not appeal it and the Commission removed it only as a matter of law?

**Statement of the Case**

## 1. Statutory and regulatory framework

Congress enacted the Mine Act to improve and promote safety and health in the Nation's mines in order to protect mining's "most precious resource – the miner." 30 U.S.C. 801. The Mine Act authorizes the Secretary, acting through MSHA, to promulgate mandatory safety and health standards "for the protection of life and prevention of injuries in coal or other mines." 30 U.S.C. 811(a). The

Secretary enforces the Mine Act by authorizing MSHA inspectors to inspect mines and issue citations or orders to operators who violate the Act and MSHA-promulgated standards. 30 U.S.C. 813-814.

The Mine Act also established the Commission, an independent agency, to adjudicate many Mine Act disputes. Commission ALJs conduct trial-type hearings, and the Commission provides administrative appellate review. 30 U.S.C. 823(d).

### a. Significant and substantial violations

If a violation of one of MSHA's mandatory safety or health standards is "of such a nature as could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard," the Secretary, acting through MSHA inspectors, has discretion to designate the violation as significant and substantial. 30 U.S.C. 814(d). An S&S designation is the basis for elevated enforcement mechanisms available to the Secretary. It can, for example, provide the basis for a "pattern of violations" designation. 30 U.S.C. 814(e). And if an MSHA inspector determines that a violation is S&S and results from the operator's "unwarrantable failure to comply" with the standard, the inspector issues a citation that starts a "'chain' of increasingly severe sanctions," including possible withdrawal orders prohibiting operations in the affected areas of mines.

*RAG Cumberland Res. LP* v. *FMSHRC*, 272 F.3d 590, 592-593 (D.C. Cir. 2001); 30 U.S.C. 814(d).

The Commission developed a test for evaluating whether a violation is S&S. In 1981, shortly after its creation, the Commission held that a violation is S&S if, "based upon the particular facts surrounding [a] violation, there exists a reasonable likelihood that the hazard contributed to will result in an injury or illness of a reasonably serious nature." *Cement Div., Nat'l Gypsum Co.*, 3 FMSHRC 822, 825 (1981). Notably, the Commission in *National Gypsum* focused on whether the hazard was likely to cause serious injury, not whether the violation was likely to cause the hazard. And it articulated its understanding of the key terms of the S&S provision at 30 U.S.C. 814(d):

> Although the Act does not define the key terms "hazard" or "significantly and substantially," in this context we understand the word "hazard" to denote a measure of danger to safety or health, and that a violation "significantly and substantially" contributes to the cause and effect of a hazard if the violation *could* be a major cause of a danger to safety or health. In other words, the contribution to the cause and effect must be significant and substantial.

*Id.* at 827 (emphasis added).

6

Three years later, the Commission reframed this standard in what has become known as the *Mathies* S&S test. *Mathies Coal Co.*, 6 FMSHRC 1 (1984). In *Mathies*, the Commission set out a four-step analysis:

> In order to establish that a violation of a mandatory safety standard is significant and substantial . . . the Secretary of Labor must prove: (1) the underlying violation of a mandatory safety standard; (2) a discrete safety hazard—that is, a measure of danger to safety—contributed to by the violation; (3) a reasonable likelihood that the hazard contributed to will result in an injury; and (4) a reasonable likelihood that the injury in question will be of a reasonably serious nature. As a practical matter, the last two elements will be combined in a single showing.

*Ibid.* at 3-4. This Court has not affirmatively endorsed that test. *Sec'y of Lab.* v. *Consolidation Coal Co.*, 895 F.3d 113, 115 n.1 (D.C. Cir. 2018) ("This court has yet to endorse the *Mathies* test. We need not do so in this case because, as in past cases, the parties have not challenged its application."); *Cumberland Coal Res., LP* v. *FMSHRC*, 717 F.3d 1020, 1027 (D.C. Cir. 2013) ("we do not intend to imply that we are adopting the *Mathies* test, the validity of which is not challenged here").

For years, the courts of appeals and the Commission held that step two of *Mathies* did not require the Secretary to prove that the violation was reasonably likely to cause the hazard. *Knox Creek Coal Corp.* v. *Sec'y of Lab.*, 811 F.3d 148, 164 (4th Cir. 2016) (noting that at step two, "the Secretary must establish that the violation contributes to a discrete safety hazard," and at steps three and four, "that

7

the hazard is reasonably likely to result in a serious injury"); *Peabody Midwest Mining, LLC* v. *FMSHRC*, 762 F.3d 611, 616 (7th Cir. 2014) ("the question is not whether it is likely that the hazard . . . would have occurred; instead, the ALJ had to determine only whether, if the hazard occurred (regardless of the likelihood), it was reasonably likely that a reasonably serious injury would result"); *Musser Eng'g, Inc.*, 32 FMSHRC 1257, 1280 (2010) (step two "requires consideration of whether a discrete safety hazard - that is, a measure of danger to safety - is contributed to by the violation. *There is no requirement of 'reasonable likelihood.'*") (emphasis added). Instead, step two required proof only that the violation contributed to the hazard. *Musser*, 32 FMSHRC at 1280.

In 2016, the Commission abruptly changed its test. Over a dissent, in *Newtown Energy, Inc.*, the Commission majority changed step two, requiring that the Secretary prove, based on the particular facts surrounding the violation, that the violation was *reasonably likely* to result in the hazard. 38 FMSHRC 2033, 2038 (2016). And in this case, again over a dissent, the Commission required proof that the violation was *reasonably likely to cause* the hazard. JA 303.

### b. Emergency standards

Some of MSHA's standards are emergency standards—standards that "protect specifically against hazards that may arise after an emergency has already

occurred." *Cumberland*, 717 F.3d at 1026. Mine emergencies are rare, so requiring proof that the emergency was likely to occur would mean that virtually no violations of emergency standards would be S&S, even though those violations may well cost miners their lives. For these reasons, the Commission has held, and this Court has affirmed, that when analyzing whether a violation of an emergency standard is S&S—i.e., whether the violation could substantially and significantly contribute to the cause and effect of a hazard—factfinders are to assume the existence of the emergency at which the standard is aimed—the "contemplated emergency." *Cumberland Coal Res., LP*, 33 FMSHRC 2357 (2011), *aff'd*, 717 F.3d 1020. This Court has explained that, without that assumption, it is unlikely that the violation of an emergency standard would ever be "significant and substantial" because the violation "would never, or at least rarely" cause the emergency itself. *Cumberland*, 717 F.3d at 1027. This would be an incongruous result given that the violation of emergency standards "could be expected to have serious, indeed tragic, consequences," potentially costing miners their lives. *Ibid.*

### c. Emergency response plans and refuge alternatives

In underground coal mines, there is an ever-present threat of disaster. Roof falls can cut miners off from exits. Floods and toxic gases can inundate an area and trap miners and other individuals present underground. Fires or explosions can

destroy entire areas, making it next-to-impossible to see or breathe. See *Refuge Alternatives for Underground Coal Mines*, 73 Fed. Reg. 34140, 34141 (June 16, 2008).

In 2006, a series of mine disasters like these drew national attention. On January 2, 2006, twelve miners died and one was seriously injured after an explosion in the Sago Mine in Upshur County, West Virginia. U.S. Dep't of Lab., MSHA, Report of Investigation on the Sago Mine Disaster (May 9, 2007), available at https://www.msha.gov/sites/default/files/Data_Reports/ftl06C1-12wa.pdf. Weeks later, on January 19, 2006, two miners died in a fire at the Aracoma Alma Mine #1 in Logan County, West Virginia. U.S. Dep't of Lab., MSHA, Report of Investigation on the Aracoma Coal Mine Fire (2007), available at https://arlweb.msha.gov/fatals/2006/aracoma/FTL06c1415.pdf. And on May 20, 2006, five miners died and one was injured after an explosion at the Darby Mine No. 1 in Harlan County, Kentucky. U.S. Dep't of Lab., MSHA, Report of Investigation on the Darby Mine Disaster (Apr. 12, 2007), available at https://arlweb.msha.gov/fatals/2006/Darby/FTL06c2731.pdf.

In response to these disasters, Congress passed the Mine Improvement and New Emergency Response (MINER) Act. It amended the Mine Act to provide greater protections for underground coal miners and improve emergency preparedness. Among other requirements, the MINER Act requires mine

operators to develop and adopt MSHA-approved emergency response plans (ERPs). 30 U.S.C. 876. ERPs must provide for "the maintenance of individuals trapped underground in the event that miners are not able to evacuate the mine." 30 U.S.C. 876(b)(2)(B). This requirement codified Congress's belief that "refuge chambers may be a viable means to protect miners' lives in the event they are unable to evacuate from the mine." S. Rep. No. 109-365, at 10 (2006).

MSHA has promulgated standards under the MINER Act requiring all ERPs to provide for refuge chambers, also called "refuge alternatives." 30 C.F.R. 75.1506. Refuge chambers are required to protect persons trapped underground "when a life-threatening event occurs that makes escape impossible." *Refuge Alternatives for Underground Coal Mines*, 73 Fed. Reg. 80656, 80656 (Dec. 31, 2008). They are the last line of defense. They must be able to withstand harsh environments and provide food, water, and breathable air to sustain miners and other persons for at least 96 hours. See 30 C.F.R. 75.1507. They are not comfortable, but they are designed to keep people alive until they can be rescued.

Refuge chambers for working sections must "accommodate the maximum number of persons that can be expected on or near the section at any time." 30 C.F.R. 75.1506(b)(2).

Refuges also must be placed within 1,000 feet of the nearest working face. 30 C.F.R. 75.1506(c)(1). However, they must *not* be placed "within the direct line of sight of the working face" (the place where miners are cutting the coal from the coal seam). 30 C.F.R. 75.1507(a)(11)(i). This requirement was based on a recommendation from NIOSH, and is meant to "address[] the potential damage from a working face explosion" and "minimize the heat or explosive forces that could occur and affect the safety of persons in the refuge alternative." *Refuge Alternatives for Underground Coal Mines*, 73 Fed. Reg. at 34161. In other words: significant explosions generate tremendous forces that have to go somewhere; they generally go down the path directly in front of them. If a refuge chamber is in that path, it likely will be destroyed or at least rendered unusable.

## 2. Factual background

Peabody Midwest Mining, LLC operates the Francisco Underground Pit, an underground coal mine in Gibson County, Indiana. JA 242, 243. The mine has three working sections known as units, which are each identified by number. JA 95. In 2014, MSHA approved the mine's ERP. JA 220. As required by MSHA standards, the ERP requires that "[r]efuge chambers will not be placed in direct line of sight of the working face." JA 221.

12

It is undisputed that, when this citation was issued, Peabody had to provide two refuge chambers at each working section at the Francisco Underground Pit. JA 81-82. Each of those refuges has the capacity to maintain 20 persons (for a total of up to 40 persons) for 96 hours. JA 82. This number was consistent with MSHA's general standard requiring that refuge chambers accommodate the maximum number of persons who could be expected on or near the section at once. During shift changes, approximately 30 miners would be present on the #1 Unit. JA 295.

As the working face advances—that is, as the work of excavating moves forward—refuge chambers must be moved up to comply with the 1,000-feet requirement. JA 100. On July 18, 2017, Foreman Mark Bedwell repositioned Unit 1's two refuge chambers. JA 113. He placed one of the refuges in a crosscut—a smaller tunnel, perpendicular to and connecting the larger tunnels that run into a mine—and he placed the other in the direct line of sight of the working face. JA 113-14.

On July 19, 2017, MSHA inspector Bryan Wilson inspected the Francisco Underground Pit. JA 22. When inspecting Unit #1, he discovered two refuge chambers, each of which could fit 20 people for 96 hours. JA 28, 31. One refuge chamber had been appropriately placed in a crosscut. JA 43. The other, however, had been placed in direct line of sight of the working face. JA 27-28.

Inspector Wilson issued a Section 104(d)(1) citation for a violation of the mine's ERP, alleging that the second refuge chamber in Unit # 1 was illegally placed in direct line of sight of the working face. JA 219. He designated the citation as S&S and as an unwarrantable failure to comply with a mandatory health or safety standard. *Ibid.*; see 30 U.S.C. 814(d)(1). MSHA proposed a penalty of $44,546. JA 246.

### a. The ALJ's decision

After a hearing, a Commission ALJ affirmed the violation, as well as its S&S and unwarrantable failure designations.

Applying the *Newtown* formulation of the *Mathies* test, the ALJ found all four steps to be satisfied. JA 247-49. At step two, the ALJ noted that Commission precedent required that "when determining whether a violation of an emergency standard is S&S, the violation should be considered in the context of the emergency contemplated by the standard and the court should assume the existence of the emergency when defining the hazard." JA 247. Noting that the "contemplated discrete safety hazard" was that "in an emergency situation where evacuation is impossible, miners would be unable to follow the ERP and access or utilize a refuge chamber," the ALJ found that Peabody's failure to comply with its ERP was "reasonably likely to contribute to the discrete safety hazard of miners being unable

14

to use the refuge chamber." JA 248. Peabody argued that the only time more than 20 miners would be on or near the face was during a shift change, and that there was no active mining during that time, so an ignition would be unlikely during that time. *Ibid.* The ALJ rejected that argument, specifically noting that "[c]onsideration of whether the mine's conditions are likely to cause an explosion at the face is irrelevant because an explosion or ignition event must be assumed in the context of the standard." *Ibid.* Assuming such an ignition or explosion, the ALJ found that the third and fourth *Mathies* steps were also met, since "the hazard of miners being unable to effectively use a refuge chamber is reasonably likely to result in fatal injuries." JA 249.

### b. The Commission's decision

Peabody appealed to the Commission, which, in a split decision, removed the S&S designation and, consequently as a matter of law, the unwarrantable-failure designation. JA 294; see *Sec'y of Lab.* v. *FMSHRC*, 111 F.3d 913, 919 (D.C. Cir. 1997) ("*JWR*") (holding that this type of citation can be affirmed only with both designations).

The Commission first articulated a revised version of the *Mathies* test for determining whether a violation is significant and substantial. Relying on the modification of step two of the *Mathies* test that it had previously articulated in

*Newtown Energy*, the Commission declared the "proper test for an S&S violation"

to be as follows:

> In order to establish that a violation of a mandatory safety standard is significant and substantial, the Secretary of Labor under *National Gypsum* must prove:  (1) the underlying violation of a mandatory safety standard; (2) the violation was reasonably likely to cause the occurrence of the discrete safety hazard against which the standard is directed; (3) the occurrence of that hazard would be reasonably likely to cause an injury; and (4) there would be a reasonable likelihood that the injury in question would be of a reasonably serious nature.

JA 298.

The Commission determined that the Secretary failed to show that the

violation was S&S because she failed to establish that the violation was reasonably

likely to cause the hazard, as required by Step Two of its reformulated *Mathies* test.

JA 303. The Commission nominally recognized that for an emergency standard, it

must assume the existence of the contemplated emergency. JA 299. It

characterized the contemplated emergency in this case as "an assumed explosion

on the face that destroys or renders unusable the refuge chamber left exposed"

(i.e., the refuge chamber that had been placed in direct line of sight on the working

face). *Ibid*. However, the Commission did not assume an explosion that would

require the exposed refuge chamber to be used—including one that would occur

when there were more than 20 persons on or near the working face.

The Commission determined that the Secretary failed to satisfy step two of the reformulated *Mathies* standard because the Secretary failed to present sufficient proof that Peabody's unlawful placement of a refuge was reasonably likely to cause the "hazard" against which the standard was directed," which it identified here as the hazard that "a miner will not have a place of refuge." JA 303; 299. Specifically, the Commission found that there was not proof of a "plausible ignition source" that would cause an explosion during a shift change when more than 20 miners were present (and both refuge chambers would therefore be needed). JA 301. Having found that "there is no proof of an unavailability of shelter for any affected miner . . . when an explosion might occur," the Commission concluded that there was no "reasonable likelihood" that the violation would lead to the hazard of insufficient miner refuge. JA 303.

Relatedly, the Commission found that the Secretary failed to satisfy step three of the *Mathies* test, because the Secretary had "not shown any mining activities that could cause an explosion occurring while there were more than 20 miners on the section." *Ibid*.

The Commission remanded the case for the ALJ to assess a penalty with the S&S designation removed. JA 304. The Secretary filed a petition for discretionary review of the ALJ's decision on remand, challenging the underlying Commission

decision. The Commission granted the petition. After a prolonged delay, the Commission vacated its direction for review, and the Secretary filed a petition for review of the Commission's June 2, 2020 decision in this Court.

## Summary of Argument

The Commission made two legal errors: it failed to assume the contemplated emergency, and it required the Secretary to prove that the violation was *reasonably likely to cause the occurrence of* the discrete safety hazard to demonstrate that the violation was significant and substantial. When these errors are corrected, the evidence compels the finding that the violation was S&S, and the unwarrantable failure designation must be reinstated as a matter of law.

First, factfinders must assume the existence of the emergency that is contemplated by an emergency standard when evaluating whether a violation of that standard is S&S. *Cumberland*, 717 F.3d at 1025-1028. Here, in evaluating whether Peabody's violation was S&S, the Commission assumed *an* emergency, but it assumed the wrong one: it did not assume an emergency that would require the use of the refuge chamber that was placed in direct line of sight of the working face.

The Commission majority insisted that it was adhering to its, and to this Court's, assume-the-emergency rule. But it was not; it required proof of an ignition

18

source during shift changes at the mine. Requiring this proof does not assume the emergency contemplated by Peabody's ERP and MSHA's standards.

Second, to show that a violation was significant and substantial under Section 104(d), the Secretary need demonstrate only that the violation could contribute to a discrete hazard that is more than remote or speculative. This is the plain meaning of the statute: it is supported by the text and structure of the Mine Act, the history of the S&S provision, and the Act's protective purpose. The text of Section 104(d) says that a violation is S&S if it *could* significantly and substantially contribute to the cause and effect of the hazard. "Could" means possible, not "reasonably likely." That difference also is reflected in the structure of the Mine Act: MSHA can issue withdrawal orders for "imminent dangers," which are defined as "the existence of any condition or practice in a coal or other mine which *could reasonably be expected to cause death or serious physical harm* before such condition or practice can be abated." 30 U.S.C. 802(j) (emphasis added). If Congress meant to impose a "reasonably likely" requirement like this on S&S violations, it would have. And the legislative history of the Act shows clearly that when Congress adopted Section 104(d), it rejected previous, restrictive interpretations of the S&S provision and intended that the provision include "all violations, *whether or not they create a hazard which poses a danger to miners* as long as

19

they are not of a purely technical nature." S. Rep. No. 95-181, at 31 (emphasis added).

No court of appeals has held that the Secretary must prove that a violation was *reasonably likely to cause the occurrence of* a discrete safety hazard to prove that a violation was S&S. And such a requirement undermines the protective purpose of the Mine Act, by throttling the Secretary's use of one of the Act's most important enforcement tools.

Once the correct contemplated emergency is assumed and the correct formulation of step two of *Mathies* is applied, the evidence compels the conclusion that this violation was S&S. Assuming an explosion at the working face that rendered the exposed refuge chamber unusable, during shift change when the maximum number of persons who could be on the working section were present, ten miners would be left without protection from the harsh environment, and without air to breathe or food and water to sustain them. Analyzed under the *Mathies* framework, the refuge chamber's placement in the direct line of sight of the working face could contribute to the hazard of miners being left without the protection a refuge chamber provides, a hazard that is reasonably like to cause injury of a reasonably serious nature. The violation's unwarrantable designation also must be reinstated as a matter of law. Peabody did not appeal that designation

20

and argued only that it should be removed as a matter of law, so it follows that reinstating the S&S designation requires reinstating the unwarrantable designation, too.

## Standing

The Secretary has standing to seek review under section 106(b) of the Mine Act, 30 U.S.C. 816(b). See D.C. Cir. R. 28(a)(7). It authorizes the Secretary to seek review of any final Commission order in this court. 30 U.S.C. 816(b); see *Sec'y of Lab.* v. *Nat'l Cement Co. of Cal.*, 573 F.3d 788, 792 (D.C. Cir. 2009).

## Argument

### 1.  Standard of review

This case presents three questions.

The first question is whether the Commission erred by failing to assume the contemplated emergency. See *Cumberland*, 717 F.3d at 1026-1028. That is a legal question that this Court reviews de novo. *Sec'y of Lab.* v. *Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006).

The second question is whether the Mine Act requires the Secretary to prove that the violation could contribute to a hazard, rather than prove that the violation was reasonably likely to cause the occurrence of a hazard, in order to prove that it was S&S. This is a question of statutory interpretation. In matters of

statutory interpretation, the Court first determines whether the statute has a plain

meaning, using the traditional tools of statutory interpretation: the text, the

legislative history, and the Mine Act's miner-protective purpose. *Am. Coal Co.* v.

*FMSHRC*, 796 F.3d 18, 23-24 (D.C. Cir. 2015). If the statute's meaning is plain,

the Court applies it. If, after applying all the tools of statutory interpretation, the

Court concludes that the statute is ambiguous, the Court gives *Chevron* deference

to the Secretary's reasonable interpretation. *Sec'y of Lab.* v. *Excel Mining, LLC*, 334

F.3d 1, 5-6 (D.C. Cir. 2003). When the Secretary and the Commission differ, this

Court defers to the Secretary's interpretation. *RAG Cumberland Res., LP,* 272 F.3d

at 596. Given the Mine Act's "remedial health-and-safety" purpose, this Court

"must 'liberally construe' the Act's terms, meaning that [it is] all the more

'obliged to defer to the Secretary's miner-protective construction of the Mine Act

so long as it is reasonable.'" *Am. Coal Co.*, 796 F.3d at 24 (quoting *Sec'y of Lab.* v.

*Cannelton Indus., Inc.*, 867 F.2d 1432, 1437 (D.C. Cir. 1989)).

　　　The third is whether the evidence compels the finding that this violation was

S&S and, if so, whether the unwarrantable failure designation should be reinstated.

The first part of that question is a mixed question of law and fact, because it

"require[s] the application of a broad legal standard to particular facts . . . ."

*Barbour* v. *Browner*, 181 F.3d 1342, 1345 (D.C. Cir. 1999) (citing *Pullman-Standard*

v. *Swint*, 456 U.S. 273, 289 n.19 (1982)). The second part—whether the unwarrantable designation should be reinstated—is a question of law, reviewed de novo.

### 2.   The Commission did not assume the contemplated emergency.

The Commission must assume the contemplated emergency when deciding whether a violation of an emergency standard is S&S. *Cumberland*, 717 F.3d at 1025-1028. The Commission did assume *an* emergency, but it did not assume the *contemplated* emergency.  The contemplated emergency is one in which the standard at issue—here, the requirement that the refuge chambers not be placed in direct line of sight of the working face—comes into play.  That means the contemplated emergency is one that necessitates the use of the refuge chamber that was placed in direct line of sight of the working face.

### a.   The contemplated emergency in this case is an explosion at the working face that necessitates use of the refuge chamber that was placed in direct line of sight of the working face.

It is settled under both this Court's and the Commission's precedent that "when determining whether a violation of an emergency standard is S&S, the violation should be considered in the context of the emergency contemplated by the standard." *ICG Illinois LLC*, 38 FMSHRC 2473, 2476 (2016) (citing *Spartan Mining Co.*, 35 FMSHRC 3505, 3508-3509 (2013)); *Cumberland*, 717 F.3d at 1026-

1028. The emergency contemplated by the standard is the emergency in which the standard comes into play. See *Cumberland*, 717 F.3d at 1024-1025 (describing the Commission's view that the contemplated emergency is "the circumstance in which the safety equipment becomes relevant").

In *Cumberland*, this Court accepted the Secretary's interpretation that, for purposes of determining whether a violation of an emergency standard was S&S, the Mine Act requires the factfinder to assume that the emergency contemplated by the violated standard occurred.  That case was about whether a violation of an MSHA standard regarding the location of lifelines—physical lines that help miners evacuate an underground mine following a mine disaster—was S&S. The Court accepted the Secretary's position that "in evaluating whether a violation of [MSHA's] requirement regarding the location of lifelines" is S&S, "one should assume the occurrence of an emergency necessitating an evacuation in which the lifeline would need to be used." *Cumberland*, 717 F.3d at 1024, 1028. Likewise, in a Commission case about MSHA's escapeways standard, the contemplated emergency was one "requiring the use of the escapeways. . . ." *Spartan Mining*, 35 FMSHRC at 3509. Indeed, another Commission case involving the incorrect placement of a refuge chamber identified the contemplated emergency as one in which that refuge was necessary—i.e., "an emergency so severe as to make

24

evacuation impossible, survival outside the refuge unlikely, and travel extremely difficult in the fact of smoke, debris, and possible injury." *ICG*, 38 FMSHRC at 2477.

This approach is also consistent with the Commission's prior holdings that inspectors should assume a "worst case scenario" when determining whether emergency standard violations are S&S. *ICG*, 38 FMSHRC at 2476. This is because "[i]t is of course impossible to predict the time, location, *nature or severity* of a mine disaster." *Ibid.* at 2479 (emphasis added). Because it is impossible to predict the severity of that emergency, and because MSHA's emergency standards "protect specifically against hazards that may arise after an emergency has already occurred," *Cumberland*, 717 F.3d at 1026, for a factfinder to evaluate whether an emergency standard is S&S, the worst-case scenario must be assumed. See *ibid.* at 1028-1029 ("assuming the existence of an emergency in which a lifeline would be necessary also assumes an emergency in which all of the redundant safety measures [the operator] seeks to rely on have failed").

Likewise, in this case, the contemplated emergency is an explosion that necessitates use of the refuge chamber that was placed in direct line of sight of the working face—i.e., an explosion that requires more than 20 persons at or near the working section to seek refuge.

This is clear from the related ERP provisions in the MINER Act and the standards promulgated under it. A mine operator must develop and adopt an MSHA-approved emergency response plan (30 U.S.C. 876) that provides for the "maintenance of individuals trapped underground in the event that miners are not able to evacuate the mine." 30 U.S.C. 876(b)(2)(B). The ERP must provide for refuge chambers that, among many other requirements, are not located in direct line of sight of the working face (30 C.F.R. 75.1507(a)(11)(i)) and that can accommodate the maximum number of people present at the working face of the mine *at any time*. 30 C.F.R. 75.1506(b)(2). Both Congress and MSHA assumed that these standards would apply in the event of an emergency that traps persons underground such that they are required to use the refuge chambers.

These standards are directed at ensuring sufficient refuge for miners not just under typical mining conditions but also when the maximum number of people who could be expected at the working section of a mine are indeed present. MSHA required that these refuge chambers accommodate the maximum number of persons who might be present at the working section at *any* time. 30 C.F.R. 75.1506(b)(2). The preamble to the refuge standard notes that this provision expressly includes "all miners that join those working at the section during a shift

change." *Refuge Alternatives for Underground Coal Mines*, 73 Fed. Reg. at 80683. It specifically identifies "hot-seat" shift changes, noting that if a mine has such a practice, "the refuge alternative would need to accommodate both crews and any other persons who would routinely work near the section, such as managers, surveyors, vendors, and state and Federal inspectors." *Ibid*. During notice-and-comment, MSHA considered and rejected comments that criticized the scope of this provision, explaining that requiring refuge chambers to accommodate the number of persons present at the working face of a mine during hot seat shift changes provided "an almost 100% safety margin" to protect these individuals in the event they were unable to escape from the mine. *Ibid*. In short, it contemplated an emergency at a time when the maximum number of persons were present.

The Commission accuses the Secretary of seeking to "merge the contemplated 'emergency' with the 'hazard,'" JA 299, which the Commission has held is improper. *ICG*, 38 FMSHRC at 2476. But the Secretary does no such thing. The contemplated emergency in this case is an explosion at the working face that necessitates use of the refuge chamber. The hazard is that persons would be left without access to a refuge, and to the breathable air, water, food, and other safety provisions that the refuge offers.

The hazard and the emergency are of course related; emergency standards protect against hazards that arise only after the contemplated emergency has already occurred. And most violations of standards that contemplate emergencies logically would contribute to the anticipated hazards. But that is not universal, and the Secretary does not collapse the two. For example, 30 C.F.R. 75.1507(d) requires that a refuge must be stocked with 2000 calories of food per person per day for at least 96 hours (or 48 hours with alternative advance arrangements). This standard would come into play only in the event of an emergency in which the refuge is needed. But if an operator violated the standard by providing only 1900 calories per person per day, then depending on the circumstances, it is not a given this violation would contribute to a hazard (e.g., starvation, diabetic shock, or death), even assuming the worst-case scenario that the refuge is filled to capacity.

This court has acknowledged the Commission's "general rule" that not every violation is S&S, but it also acknowledged that "the stakes are much higher in emergency situations." *Cumberland,* 717 F.3d at 1028. Consequently, "a rule that would make many or most violations of emergency safety measures significant and substantial is distinguishable from a rule that would make all violations of all safety measures significant and substantial." *Ibid*. Assuming the existence of the contemplated emergency might make it likely that a violation of an emergency

28

standard will be S&S. But this outcome is appropriate in light of the grave risks of mine emergencies. As this Court has observed, a rule that would lead to most, if not all, violations of emergency standards is not unreasonable. See *id.*

**b. By requiring proof of an ignition source during shift change—i.e., when two refuges would be needed—the Commission failed to assume the contemplated emergency.**

The Commission failed to assume the contemplated emergency: an explosion at the working face that requires use of the refuge chamber *for persons who need to use it*—i.e., any person on the section at a time when there are more than 20 persons there. Instead of *assuming the occurrence of* an explosion that would necessitate use of the refuge chamber, the Commission *required proof* that an explosion could occur.  This is directly contrary to Commission precedent and to *Cumberland*.

Specifically, the Commission required that the Secretary provide proof of an ignition source at a particular time—when there were more than 20 persons on or near the section—in order to establish that the violation was reasonably likely to cause a hazard. In doing so, the Commission did not assume a key aspect of the contemplated emergency—that it would occur when more than 20 persons were on the section, so that two refuges were needed. JA 299-302. That was especially improper because, at this mine, at least during hot-seat shift changes, there would

be more than 20 miners on the working section. JA 82-84. Because each refuge

chamber could accommodate only 20 persons, that is when the second refuge—the

one placed in violation of the standard—would be necessary. JA 81-83. Requiring

affirmative proof that an explosion may occur at a particular time—rather than

assuming that it would occur at that time—is simply inconsistent with *Cumberland*,

for the reasons explained above.

The Commission's insistence that the Secretary provide proof of an ignition

source also ignores the practical reasons that decisionmakers must assume the

emergency—namely, that ignition sources exist and are unpredictable, even when

active mining is not occurring. Rockfalls, lightning, mantrip cars, and more have all

triggered explosions in underground coal mines. These are unpredictable events.

The Secretary cannot be required to offer proof about precisely when they are likely

to occur to justify an S&S designation of an emergency standard.

Consider, for example, the Sago Mine disaster. On January 2, 2006, an

explosion in a sealed part of the mine blew out the seals and inundated the active

parts of the mine with smoke and toxic gases. Some miners escaped, but others

could not; they barricaded themselves in a desperate attempt to stay alive. One

miner was found alive but seriously hurt; twelve miners were killed. After

investigating the disaster, MSHA identified a lightning strike, leading to radiating

electromagnetic energy that could have induced a voltage on the mine's pump

cable, as the "most likely ignition source for this explosion." Sago Disaster Report,

at 172.  It noted at least twelve other mine explosions since 1986 that had also

occurred in sealed areas of a mine, where lighting had been identified as a possible

ignition source. *Ibid.* at 156.

The Sago report identified and analyzed other potential ignition sources,

including roof falls, smoking, electric circuits, cables, equipment, and spontaneous

combustion. *Ibid.* at 150-172. It acknowledged that "the amount of energy

necessary for an ignition will vary with gas concentration," but noted that very

little is actually required – only "equivalent to about 1/50 of the static electricity

accumulated by an average sized man walking on a carpeted floor on a dry day."

*Ibid.* at 150.

Sago is a well-known example, not least because of the regulatory changes

that followed it. But it is far from the only mine accident to have been caused by an

unpredictable ignition source unrelated to active mining. In 1983, methane ignited

when it came into contact with the electrical components of a personnel carrier at a

mine in Pennsylvania, killing one miner and injuring another. U.S. Dep't of Lab.,

MSHA, Report of Investigation on the July 3, 1983 Homer City Mine Explosion 28.

A roof fall was identified as the most likely ignition source for the first of four

consecutive explosions that killed two miners at a mine in Utah in July 2000. U.S. Dep't of Lab., MSHA, Report of Investigation on the Willow Creek Mine Explosions, available at https://arlweb.msha.gov/disasterhistory/WCREEK2000/willowcreekfinal/willow creekfinal.htm#_1_27llibrary.msha.gov. The next year, a roof fall at a mine in Alabama released methane and damaged a battery. The damaged battery ignited the methane and caused two massive explosions that killed thirteen miners. U.S. Dep't of Lab., MSHA, Report of Investigation on the Jim Walter Resources No. 5 Mine Disaster (Dec. 11, 2002), available at https://arlweb.msha.gov/fatals/2001/jwr5/ftl01c2032light.pdf. Even the open flames of cigarettes, matches, and butane lighters have ignited explosions in mines, resulting in miners' deaths. See, *e.g.,* U.S. Dep't of Lab., MSHA, Report of Investigation on the Day Branch Mine Accident (May 26, 1995); U.S. Dep't of Lab., MSHA, Report of Investigation on the Elmo #5 Mine Explosion (Jan. 4, 1995). And, of course, in many cases, the source of ignition of an explosion in a mine is never identified.

The Commission tried to justify its decision by suggesting—incorrectly— that its precedent requires assuming an emergency only during active mining. JA 302 (citing *ICG*, 38 FMSHRC 2473, and *Spartan Mining*, 35 FMSHRC 3505). In

*ICG*, the Commission upheld the S&S designation on a citation for violation of a different refuge chamber standard that required the chamber to be located within 1,000 feet of the working face of the mine. 38 FMSHRC at 2473. Here, the Commission stated that in *ICG*, "there was a *working section* with mining activities *actively occurring*." JA 302. And it noted that "[t]he assumption in that case was that there would be an explosion on a *working section*" and that the "assumed triggering event for the danger . . . was an explosion on a section *where mining was actively occurring*." *Ibid*.

But that is not what *ICG* assumed. In *ICG*, the Commission identified the emergency contemplated by the standard at issue to be "an emergency so severe as to make evacuation impossible, survival outside the refuge unlikely, and travel extremely difficult in the face of smoke, debris, and possible injury." *ICG*, 38 FMSHRC at 2477. The *ICG* Commission noted the inspector's testimony at hearing, stating that "in determining whether to designate the violative condition as S&S, he assumed the occurrence of a mine disaster. He did so because refuge alternatives are only intended for use in situations in which escape is impossible, such as roof falls, fires, or explosions." *Ibid*. at 2479. Indeed, the *ICG* Commission assumed an emergency that would necessitate the use of the refuge chambers – precisely what the Commission failed to do here.

Although the *ICG* Commission noted the "presence of possible ignition sources due to equipment working near the face," *id.* at 2474, and that the mine in that case had a "specific history of methane and ignition problems," *id.* at 2479-2480, nowhere in *ICG* did the Commission qualify its assumption of the emergency as applicable *only* while mining activities are *actively occurring*, or even say that proof of an ignition source is required.

The same is true of *Spartan Mining*, 35 FMSHRC 3505. There the Commission affirmed the S&S designations on two emergency escapeway standards, reiterating that violations of emergency standards must be evaluated in the context of the contemplated emergency. *Ibid.* at 3508. Once again, the Commission's unanimous decision in *Spartan* did not restrict this rule to say that the emergency is to be assumed only during active mining. The Commission's insertion of this restriction into this case is baffling, as is its misreading of its own precedent.

In any event, the realities of mining and the Commission's previous cases underscore the importance of emergency standards and of the Secretary's ability to cite them, when appropriate, as S&S violations. Explosions have led to many of the most devastating accidents in underground coal mines. The hazards they present are precisely the sort of conditions that can justify MSHA's use of its elevated enforcement tools, including S&S designations, when the standards designed to

34

prevent them are violated. Yet the Commission's approach would effectively require the Secretary to prove the likelihood of a lightning strike in order to justify an S&S designation on an emergency standard, and would hamstring the Secretary in the exercise of her critical duties under the Mine Act.

3. **The plain meaning of "significant and substantial" requires the Secretary to prove, at step two of the *Mathies* test, only that a violation *could contribute to* a discrete hazard that is more than remote or speculative—not that a violation is *reasonably likely* to cause the occurrence of the discrete hazard.**

The Commission also erred by requiring the Secretary to establish that the violation was reasonably likely to cause the occurrence of a discrete hazard in order to be S&S. The plain meaning of Section 104(d) of the Mine Act requires the Secretary to prove that a violation *could contribute to* a discrete hazard that is more than remote or speculative. It does not require that the Secretary establish that a violation is *reasonably like to cause the occurrence of* that hazard. The Commission's approach departs from the statutory text, ignores the legislative history, does not advance the purpose of the S&S provision or of the Mine Act generally, and contradicts decisions from the courts of appeals.

This Court uses traditional tools of statutory construction to determine whether a statute's meaning is plain. That includes the statute's text and structure, *CalPortland Co., Inc.* v. *FMSHRC*, 839 F.3d 1153, 1163 (D.C. Cir. 2016); its

35

legislative history, *Thunder Basin Coal Co.* v. *Reich*, 510 U.S. 200, 209-212 (1994); and its purpose, *Petit* v. *U.S. Dep't of Educ.*, 675 F.3d 769, 781 (D.C. Cir. 2012). All three support the Secretary's position that a violation is S&S if it *could contribute to* a discrete hazard that is more than remote or speculative.

### a. Statutory text & structure

In determining a statute's plain meaning, this court considers "'the particular statutory language at issue, as well as the language and design of the statute as a whole.'" *CalPortland*, 839 F.3d at 170 (citing *Wolf Run Mining Co.* v. *FMSHRC*, 659 F.3d 1197, 1200 (D.C. Cir. 2011)).

The language of the statute says merely that a violation is S&S if it *could* significantly and substantially contribute to the cause and effect of the hazard. But the statutory text says nothing about *reasonable likelihood* that the violation will significantly and substantially contribute to the cause and effect of that hazard. "Could" means possible. It does not mean "more likely than not." And it does not mean "reasonably likely."

When Congress passed the Mine Act, "could" meant to "be made *possible or probable* by circumstances to," or to "be inherently able or designed to." Webster's Third New International Dictionary 323 (1961) (emphasis added). Another contemporaneous dictionary defined it to mean, "possession of a specified

36

capacity" or a "possible contingency." The American Heritage Dictionary of the English Language 194 (1969). It means the same thing today. See, *e.g.*, The American Heritage Dictionary of the English Language 269 (4th ed. 2000) (the word is "used to indicate *possibility or* probability") (emphasis added). The statute's use of the word "could" captures Congress's intent that an S&S violation have a more than remote chance of contributing to the cause and effect of a hazard, but that it need not be especially likely to do so.

The "language and design of the [Mine Act] as a whole," *CalPortland*, 839 F.3d at 170, support this interpretation. Consider the Act's imminent danger provisions. 30 U.S.C. 802(j), 817(a). The Act defines "imminent danger" as "the existence of any condition or practice in a coal or other mine which *could reasonably be expected to cause death or serious physical harm* before such condition or practice can be abated." 30 U.S.C. 802(j) (emphasis added). If an inspector finds that an imminent danger exists, that inspector may order an operator to withdraw all persons from the affected area and prevent others from entering until the imminent danger and its causes are eliminated. 30 U.S.C. 817(a).  When Congress uses a term in one section of a statute but a different term in another, that difference is presumed to be intentional. *Village of Barrington, Ill.* v. *Surface Transp. Bd.*, 636 F.3d 650, 661 (D.C. Cir. 2011) (citing *Russello* v. *U.S.*, 464 U.S. 16, 23 (1983)).

Congress used explicit language requiring a finding of reasonable likelihood of a hazard with respect to imminent dangers. It could have done the same regarding S&S findings. It did not.

Moreover, the coexistence of Sections 104(d) and 107(a) shows that the Mine Act recognizes that violations vary in the degree to which they are likely to contribute to a hazard. It contemplates that some conditions are *reasonably expected* (likely) to cause significant hazards such as death or serious physical harm; those are imminent dangers. It also recognizes that some conditions may or may not be *likely* to contribute to a hazard, but that once those hazards do exist, they *are* likely to seriously injure a miner; those are significant and substantial violations.  The Commission's insertion of a "reasonable likelihood" requirement into step two of the *Mathies* analysis collapses the distinction between imminent danger orders and S&S violations, counter to the structure of the Act.

To be sure, the Secretary's interpretation does not read out the key modifiers—"significantly" and "substantially"—from the statute. Those words focus not on the likelihood that the violation *will* cause the hazard, but on whether the violation is of such nature that it *could* be a *significant and substantial* cause of a hazard.

That is consistent with how this Court has interpreted the statute. In *JWR*, this Court explained that "[t]he statute requires a decisionmaker, having found a violation, to make two additional findings: whether there is a 'hazard' to which the violation *might* contribute; and, if so, whether the violation 'significantly and substantially' contributes to that 'hazard.'" 111 F.3d at 917 (emphasis added). And this Court has emphasized that the statute focuses on the *nature* of the violation (i.e., its ability to contribute to a hazard), not on the likelihood that the hazard will occur. *Ibid.* Consider, for example, the violation in *JWR*. In that case, there was a pile of combustible trash, separated by a curtain; a small part of the pile was on one side of the curtain, which violated MSHA's standards, but most of the pile was on the other side of the curtain and did not violate MSHA's standards. This Court affirmed the Commission's determination that the violation was not S&S, noting that "Although the Secretary's evidence may suggest that the [nonviolative] trash enhanced the danger of fire, a reasonable factfinder could have concluded that the record contained insufficient evidence that this danger was markedly increased by the few additional [violative] items." *Id.* at 918. In other words, though the violative trash could contribute to a hazard, that contribution was not significant and substantial.

39

### b. Legislative history

The legislative history of the Mine Act makes clear that it does not require proof that a violation is reasonably likely to cause a hazard in order for the violation to be S&S.

One of the Mine Act's predecessor statutes was the Federal Coal Mine Health and Safety Act of 1969 (Coal Act). The S&S language contained in Section 104(d) of the Mine Act is unchanged from Section 104(c) of the Coal Act:

> If, upon any inspection of a coal mine, an authorized representative of the Secretary finds that there has been a violation of any mandatory health or safety standard, and if he also finds that, while the conditions created by such violation do not cause imminent danger, *such violation is of such nature as could significantly and substantially contribute to the cause and effect of a mine safety or health hazard*, and if he finds such violation to be caused by an unwarrantable failure of such operator to comply with such mandatory health or safety standards, he shall include such finding in any notice given to the operator under this chapter.

30 U.S.C. 814(c)(1) (1976) (emphasis added).

The Interior Board of Mine Operations Appeals, which adjudicated Coal Act disputes, initially interpreted Section 104(c)(1) quite narrowly, holding in a 1974 case that a "[a]n inspector is justified under section 104(c) of the Act, in finding that a violation could significantly and substantially contribute to the cause and effect of a mine safety or health hazard if the evidence shows that the condition or

practice cited as a violation *posed a probable risk* of serious bodily harm or death."

*Eastern Assoc. Coal Corp.*, 3 IBMA 331, 334 (1974) (emphasis added).

But in 1976, the IBMA reversed course in response to this Court's opinion in

*Ziegler Coal Co.* v. *Kleppe*, 536 F.2d 398 (D.C. Cir. 1976). It articulated an expansive

interpretation of "significant and substantial":

> Our position now is that these words, when applied with due regard to their literal meanings, appear to bar issuance of notices under Section 104(c)(1) in two categories of violations, namely, violations posing no risk of injury at all, that is to say, purely technical violations, and violations posing a source of *any* injury which has only a remote or speculative chance of coming to fruition.

*Alabama By-Products Corp.*, 7 IBMA 85 (1976).

The 1977 Mine Act was enacted less than a year after that decision. It

incorporated the S&S language into Section 104(d), exactly as it had appeared in

the 1969 Act. 30 U.S.C. 814(d).

The Senate Report harshly criticized the IBMA's *Eastern Associated Coal*

interpretation of S&S, describing it as "an unnecessarily and improperly strict view

of the 'gravity test,'" one that "has required that the violation be so serious as to

very closely approach a situation of 'imminent danger. . . .'" S. Rep. No. 95-181, at

31. It favorably discussed the more recent *Alabama By-Products* decision, noting

"with approval that the Board of Mine Operations Appeals has reinterpreted the

'significant and substantial' language in [that decision,] and ruled that only notices for purely technical violations could not be issued under Sec. 104(c)(1)." *Id*.

The Senate Report expressed Congress's intent to adopt the *Alabama By-Products* interpretation that a violation need not create a hazard of a particular degree of likelihood to be designated S&S:

> The Board's holding in Alabama By-Products Corporation is consistent with the Committee's intention that the unwarranted failure citation is appropriately used for all violations, *whether or not they create a hazard which poses a danger to miners* as long as they are not of a purely technical nature. The Committee assumes, however, that when "technical" violations do pose a health or safety danger to miners, and are the result of an "unwarrantable failure" the unwarrantable failure notice will be issued.

*Id*. (emphasis added).[1]

This Court relied on this legislative history in *Consolidation Coal Co.* v. *FMSHRC*, 824 F.2d 1071 (D.C. Cir. 1987), where it accepted a presumption that violations of MSHA's respirable dust standard were S&S. It discussed Congress's intent that "all except 'technical violations' of mandatory standards to be considered significant and substantial" and that violations be designated as S&S "'*whether or not they create a hazard* which poses a danger to miners as long as they

---

[1] The Senate Report discusses unwarrantable failure designations, too, since citations issued under this section must be both S&S and an unwarrantable failure. 30 U.S.C. 814(d)(1); *JWR*, 111 F.3d at 919.

are not of a purely technical nature." *Id.* at 1085 (quoting S. Rep. No. 95-181, at 31) (emphasis added). And it noted that the Commission's decisions in *National Gypsum* and *Mathies* departed from that approach (at least for violations of safety standards, rather than health standards). *Ibid.*[2] It is time to correct, in part, that departure.

The legislative history of the Mine Act's S&S provision shows Congress' clear intent that S&S violations do not have to be reasonably likely to cause a hazard. Congress rejected the IBMA's "improperly strict" view of the S&S standard in favor of the more expansive approach of *Alabama By-Products*. It criticized the IBMA's moves to collapse the distinction between unwarrantable failures and imminent dangers. And it noted with approval an interpretation of S&S that ruled out only purely technical violations and violations posing an injury with only a remote or speculative chance of occurring. By increasingly restricting the

---

[2] That decision suggests some confusion about the Commission's and the Secretary's roles. The Commission has no enforcement authority, and therefore no "past practice" of designating violations as S&S that it could change. The Secretary's enforcement practice was, as the Court noted, to designate all but non-technical violations as S&S. That practice changed only in response to the Commission's decisions, but complying with those decisions does not mean the Secretary agrees with them. See, *e.g.*, *The "Significant and Substantial" Phrase in Sections 104(d) and (e) of the Federal Mine Safety and Health Act of 1977: Interpretive Bulletin*, 63 Fed. Reg. 6012 (Feb. 5, 1998).

meaning of S&S, the Commission has done precisely what Congress instructed it not to do. Congress soundly rejected this restrictive interpretation in 1977. This Court should do the same.

### c. Courts of appeals' interpretations

Every court of appeals to consider whether step two requires proof that a violation is reasonably likely to cause the hazard has agreed that it does not. In 2014, the Seventh Circuit held that "[a] violation is significant and substantial if it *could* lead to some discrete hazard, the hazard was reasonably likely to result in injury, and the injury was reasonably likely to be reasonably serious," and it rejected the argument that a violation is S&S only if the hazard is reasonably likely to occur: "the question is not whether it is likely that the hazard . . . would have occurred; instead, the ALJ had to determine only whether, if the hazard occurred (regardless of the likelihood), it was reasonably likely that a reasonably serious injury would result." *Peabody Midwest*, 762 F.3d at 616 (emphasis added).

And most recently, the Fourth Circuit noted that step two requires only a finding that a "violation contributes to a discrete safety hazard," and did not require proof at step two that the violation was reasonably likely to cause the hazard. *Knox Creek*, 811 F.3d at 164, 163.

### d. Protective purpose

The Commission's restrictive view of the S&S test undercuts the protective purpose of the Mine Act. It would frustrate the expansive protective purposes of the Mine Act to exempt violations that could contribute significantly and substantially to, but are not reasonably likely to cause, hazards from the Secretary's enhanced enforcement tools.

The S&S designation is "the primary sanction [operators] fear under the Mine Act." *Knox Creek*, 811 F.3d at 162 (citation omitted). Once a violation has been designated S&S, the operator may be subject to increasingly severe enforcement actions under Sections 104(d) and (e) of the Mine Act. The unwarrantable failure provision in Section 104(d) addresses violations resulting from an operator's indifference or other aggravated conduct in permitting, or refusing to correct, a known violative condition. It provides for increasingly severe consequences for repeat unwarrantable violations, including a withdrawal order requiring the removal of miners until the condition is corrected. 30 U.S.C. 814(d). To trigger the unwarrantable failure provision, the first citation must be S&S. And under Section 104(e), MSHA may issue a pattern of violations notice to an operator who has a pattern of S&S violations. That provision allows MSHA to identify

45

habitual violators and, if necessary to root out actual and potential mine health and safety hazards, shut down parts of their mines. 30 U.S.C. 814(e).

These enhanced enforcement tools are critical to MSHA's duty to enforce the Mine Act, carrying out Congress's intent to prevent mine hazards and eliminate the risk of accidents, injuries, or illnesses affecting miners. The legislative history suggests that Congress deliberately established a low threshold for finding a violation to be S&S so that the Secretary could make full use of these tools.

And more broadly, the Mine Act's "primary purpose . . . [is] to protect mining's most valuable resource—the miner." *Am. Coal Co.*, 796 F.3d at 24 (citing *Int'l Union, United Mine Workers* v. *MSHA*, 823 F.2d 608, 617 (D.C. Cir. 1987)). Mining is a dangerous industry, and its hazards can be unpredictable. The work can expose miners to hazards that expose them to risk of serious injury but may not be especially likely to occur. But that does not diminish the Secretary's interest—and duty under the Mine Act—to protect miners from *all* safety and health hazards. And serious (even if unlikely) safety and health hazards are exactly the kind of risk against which the Mine Act was drafted to guard, and for which its elevated enforcement schemes—the basis of which are the S&S designation—were designed.

e. **The Commission's changes to step two since *Newtown* are an unacknowledged and unjustified departure from precedent.**

The Commission cannot depart from its own precedent without explanation. *Lone Mountain Processing, Inc.* v. *Sec'y of Lab.*, 709 F.3d 1161, 1163 (D.C. Cir. 2013). But that is exactly what it has done here. The Commission has applied the *Mathies* test since 1981, and for 35 years, it did not require proof at step two that a violation was reasonably likely to cause the hazard. See, *e.g.*, *Oak Grove Res., Inc.*, 37 FMSHRC 2687, 2692-2694 (2015) (removing an S&S designation because there was not substantial evidence showing that the violation contributed to the hazard); *Musser Eng'g, Inc.*, 32 FMSHRC at 1280 (stating that there was "no requirement of 'reasonable likelihood'" at step two).

But in 2016, the majority of a divided Commission changed the step two inquiry to ask "whether [the] hazard was reasonably likely to occur given the particular facts surrounding [the] violation." *Newtown Energy Inc.*, 38 FMSHRC at 2041. Whether to change step two was not an issue on appeal; instead, the Commission majority reached that issue on its own, based on its desire to do so "in light of recent appellate decisions . . . ." *Id.* at 2036. The main decision the Commission referred to was the Fourth Circuit's decision in *Knox Creek*, which held that at step three, the hazard must be assumed and no showing regarding the

47

likelihood of the hazard is necessary. *Knox Creek*, 811 F.3d at 163.

Addressing this holding, the *Newtown* majority insisted that there was "no basis for an inference that the [Fourth Circuit] was considering changing, let alone intending to change, [the Commission's] long-existing reasonable likelihood standard . . . ." 38 FMSHRC at 2039. But the "long-existing reasonable likelihood standard" that *Knox Creek* discussed had nothing to do with step two; rather, it was the requirement at step three "that the hazard is reasonably likely to result in an injury-producing event." *Knox Creek*, 811 F.3d at 163. And, as a partially dissenting opinion pointed out, the Commission had never previously applied a "reasonable likelihood" requirement at step two. *Newtown*, 38 FMSHRC at 2052 (op. of Comm'rs Jordan and Cohen). The Fourth Circuit could not possibly have endorsed a step-two reasonable likelihood standard that did not exist.

What the Fourth Circuit *did* do was contrast the standard that applies at steps three and four (reasonable likelihood) with a different standard that applies at step two: at step two, "the Secretary must establish that the violation contributes to a discrete safety hazard," and at steps three and four, the Secretary must "establish that the hazard is reasonably likely to result in a serious injury." *Knox Creek*, 811 F.3d at 164.

48

The Commission's changes to step two are pernicious for several reasons. First, the Commission cannot search for matters to opine on; it is constrained to decide cases based on the legal issues as presented by the parties. *Sec'y of Lab.* v. *Westfall Aggregate & Materials, Inc.*, 64 F.4th 315, 324-25 (D.C. Cir. 2023). Its decision in *Newtown* strayed far beyond those bounds. Second, the Commission cannot depart from its precedent without acknowledgment or explanation. *Lone Mountain Processing, Inc.* v. *Sec'y of Lab.*, 709 F.3d 1161, 1163 (D.C. Cir. 2013). Nowhere in *Newtown* or in this case did it acknowledge that its previous decisions did not require proof of reasonable likelihood at step two. Third, and most fundamentally, the Commission cannot second-guess the decisions of the courts of appeals, even—and especially—if it disagrees with them. See *Yellow Taxi Co. of Minneapolis* v. *NLRB*, 721 F.2d 366, 382-383; 383 n.38 (D.C. Cir. 1983).

   **f. If the Court concludes that the Mine Act is ambiguous as to whether a violation must be reasonably likely to cause a hazard, the Secretary's interpretation is owed deference.**

The correct reading of the S&S provision of Section 104(d) of the Mine Act, in light of its text, structure, and history, is that a violation does not have to be reasonably likely to cause the occurrence of a hazard in order to be S&S. But if the Court concludes that the Mine Act is ambiguous as to whether a violation must be reasonably likely to cause a hazard in order to be S&S, it should defer to the

Secretary's reasonable interpretation. See *supra* pp. 35-49. The Secretary's position is reasonable: it is consistent with the text, structure, history, and purpose of the Mine Act. And until 2016, the Commission agreed. The Commission's post-*Newtown* step two formulation strays from the plain text of the Mine Act, Congress's intent in adopting a liberal interpretation of S&S, the expansive and remedial purpose of the Act and its enforcement scheme, and the Commission's own practice until 2016. Its interpretation is unreasonable.

Further, the Secretary's interpretation is the one that would promote safety by permitting the Secretary broad use of her elevated enforcement tools. See *United Mine Workers of Am.* v. *Dep't of Interior*, 562 F.2d 1260, 1265 (D.C. Cir. 1977) ("[s]hould a conflict develop between a statutory interpretation that would promote safety and an interpretation that would serve another purpose at a possible compromise to safety, the first should be preferred"). The Commission's, in contrast, would curtail it and compromise miner safety. The Secretary's interpretation should be preferred.

**4.   The evidence compels the conclusion that the violation was S&S, and the unwarrantable failure designation must be reinstated as a matter of law.**

This Court generally remands for the Commission to apply the correct law to the facts. See, *e.g.*, *Consolidation Coal Co.*, 895 F.3d at 119. But it does not remand

when "remand on [an] issue would serve no purpose," such as when "only one conclusion would be supportable." *Donovan ex rel. Anderson* v. *Stafford Constr. Co.*, 732 F.2d 954, 961 (D.C. Cir. 1984). There is no need for remand in this case, because when the emergency contemplated by the standard is assumed and the original *Mathies* step two is applied instead of the Commission's reformulated "reasonable likelihood" version, the underlying violation must be upheld as S&S. (That is illustrated by the fact that the ALJ already found this violation to be S&S, even applying the *Newtown* step two test.)

As discussed, the emergency contemplated by the standard at issue is an explosion at the working face that necessitates use of the refuge chamber that was placed in direct line of sight of the working face. In light of that emergency, the Secretary meets all four *Mathies* requirements:[3]

### 1) **Underlying violation of a mandatory safety standard**

The operator does not contest the fact of the violation.

---

[3] The Secretary is not asking the Court to endorse *Mathies*. Because the Commission analyzed this case under that framework, and no party has appealed that general framework (although of course the Secretary challenges the Commission's reasonable-likelihood requirement at step two), the Court should also analyze the violation under that framework.

### 2) Discrete safety hazard contributed to by the violation

The placement of this refuge chamber in direct line of sight of the working face could contribute to the hazard of persons not having a place of refuge. The record establishes that the maximum number of persons who could be on the working section is 30, when miners are changing shift. The section had two refuges. If an explosion were to occur at that time and render the exposed chamber unusable, only 20 persons would have access to the protected refuge chamber. Ten persons would be left without refuge because of the violation.

### 3) The hazard would be reasonably likely to cause an injury,[4] and

### 4) Reasonable likelihood that the injury in question would be of a reasonably serious nature

If a person were left without refuge in a worst-case scenario explosion, that person could be exposed to smoke, fire, explosive gas, carbon monoxide, rock falls, and more. Without access to the protection of the chamber, and the breathable air, water, and provisions inside, the person would be reasonably likely to be seriously or fatally injured.

The citation's unwarrantable failure designation should also be reinstated. A citation issued under Section 104(d) can be affirmed only with both an S&S

---

[4] The Commission concluded that the Secretary also failed to prove this step, JA 303, but that was based on its failure to assume the contemplated emergency.

designation and an unwarrantable failure designation. *JWR*, 111 F.3d at 919. Upon concluding that the citation was not S&S, the Commission said that the unwarrantable designation must be removed as a matter of law. JA 294. If the Court reinstates the S&S designation, it should reinstate the unwarrantable designation, as well. The ALJ initially determined that Peabody's violation was an unwarrantable failure, and Peabody did not separately appeal that finding to the Commission. JA 257 (Peabody "does not seek review of the Administrative Law Judge's unwarrantable failure finding"). Peabody argued only that the unwarrantable designation should be removed as a matter of law if the S&S designation was removed. *Ibid.* It follows that, if the S&S designation is reinstated, the unwarrantable designation should be, too.

### Conclusion

The Court should grant the petition for review; reverse the Commission's decision; and affirm the S&S designation and reinstate the unwarrantable designation, both without remand. Or, if the Court concludes that remand is necessary for the Commission to determine whether the violation is S&S, it should remand for that purpose.

Respectfully submitted,

SEEMA NANDA
  Solicitor of Labor

APRIL E. NELSON
  Associate Solicitor

EMILY TOLER SCOTT
  Counsel for Appellate Litigation

s/ ALEXANDRA J. GILEWICZ
  Attorney
  U.S. Department of Labor
  Office of the Solicitor
  Division of Mine Safety and Health
  201 12th Street South, Suite 401
  Arlington, VA 22202
  (202) 693-5414

  Attorneys for the Secretary of Labor

**Certificate of Compliance with Type-Volume Limit,**
**Typeface Requirements, and Type-Style Requirements**

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted under Fed. R. App. P. 32(f), it contains 12,051 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Microsoft Word in 14-point Equity.

s/ ALEXANDRA J. GILEWICZ
    Attorney
U.S. Department of Labor
Office of the Solicitor
Division of Mine Safety and Health
201 12th Street South, Suite 401
Arlington, VA 22202
(202) 693-5414

## Certificate of Service

I certify that I electronically filed the foregoing with the Clerk of the Court for the

United States Court of Appeals for the District of Columbia Circuit by using the

appellate CM/ECF system on May 12, 2023 and the following registered users will

be served via the CM/ECF system:


T. Jason Riley
Office of General Counsel
Federal Mine Safety and Health Review Commission
1331 Pennsylvania Ave., NW Suite 520N
Washington, D.C. 20004
jriley@fmshrc.gov

Ralph Henry Moore, III
Patrick Wayne Dennison
Fisher Phillips, LLP
Six PPG Place, Ste. 830
Pittsburgh, PA 15222

                       s/ ALEXANDRA J. GILEWICZ
                          Attorney
                       U.S. Department of Labor
                       Office of the Solicitor
                       Division of Mine Safety and Health
                       201 12th Street South, Suite 401
                       Arlington, VA 22202
                       (202) 693-5414

## Addendum – Pertinent Statutes and Regulations

30 U.S.C. 814(d) .................................................................................................. d

30 U.S.C. 802(j) ................................................................................................... d

30 U.S.C. 817(a) .................................................................................................. e

30 U.S.C. 814(e) .................................................................................................. e

30 U.S.C. 876(b)(2)(B) ........................................................................................ f

30 C.F.R. 75.1506 ................................................................................................ f

30 C.F.R. 75.1507 ................................................................................................ j

**30 U.S.C. 814(d) Findings of violations; withdrawal order**

(**1**) If, upon any inspection of a coal or other mine, an authorized representative of the Secretary finds that there has been a violation of any mandatory health or safety standard, and if he also finds that, while the conditions created by such violation do not cause imminent danger, such violation is of such nature as could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard, and if he finds such violation to be caused by an unwarrantable failure of such operator to comply with such mandatory health or safety standards, he shall include such finding in any citation given to the operator under this chapter. If, during the same inspection or any subsequent inspection of such mine within 90 days after the issuance of such citation, an authorized representative of the Secretary finds another violation of any mandatory health or safety standard and finds such violation to be also caused by an unwarrantable failure of such operator to so comply, he shall forthwith issue an order requiring the operator to cause all persons in the area affected by such violation, except those persons referred to in subsection (c) to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such violation has been abated.

(**2**) If a withdrawal order with respect to any area in a coal or other mine has been issued pursuant to paragraph (1), a withdrawal order shall promptly be issued by an authorized representative of the Secretary who finds upon any subsequent inspection the existence in such mine of violations similar to those that resulted in the issuance of the withdrawal order under paragraph (1) until such time as an inspection of such mine discloses no similar violations. Following an inspection of such mine which discloses no similar violations, the provisions of paragraph (1) shall again be applicable to that mine.

**30 U.S.C. 802(j)**

For the purpose of this chapter, the term

(j) "imminent danger" means the existence of any condition or practice in a coal or other mine which could reasonably be expected to cause death or serious physical harm before such condition or practice can be abated.

d

**30 U.S.C. 817 Procedures to counteract dangerous conditions**
**(a) Withdrawal orders**

If, upon any inspection or investigation of a coal or other mine which is subject to this chapter, an authorized representative of the Secretary finds that an imminent danger exists, such representative shall determine the extent of the area of such mine throughout which the danger exists, and issue an order requiring the operator of such mine to cause all persons, except those referred to in section 814(c) of this title, to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such imminent danger and the conditions or practices which caused such imminent danger no longer exist. The issuance of an order under this subsection shall not preclude the issuance of a citation under section 814 of this title or the proposing of a penalty under section 820 of this title.

**30 U.S.C. 814(e) Pattern of violations; abatement; termination of pattern**

(1) If an operator has a pattern of violations of mandatory health or safety standards in the coal or other mine which are of such nature as could have significantly and substantially contributed to the cause and effect of coal or other mine health or safety hazards, he shall be given written notice that such pattern exists. If, upon any inspection within 90 days after the issuance of such notice, an authorized representative of the Secretary finds any violation of a mandatory health or safety standard which could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard, the authorized representative shall issue an order requiring the operator to cause all persons in the area affected by such violation, except those persons referred to in subsection (c), to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such violation has been abated

(2) If a withdrawal order with respect to any area in a coal or other mine has been issued pursuant to paragraph (1), a withdrawal order shall be issued by an authorized representative of the Secretary who finds upon any subsequent inspection the existence in such mine of any violation of a mandatory health or safety standard which could significantly and substantially contribute to the cause and effect of a coal or other mine health or safety hazard. The withdrawal order

e

shall remain in effect until an authorized representative of the Secretary determines that such violation has been abated.

**(3)** If, upon an inspection of the entire coal or other mine, an authorized representative of the Secretary finds no violations of mandatory health or safety standards that could significantly and substantially contribute to the cause and effect of a coal or other mine health and safety hazard, the pattern of violations that resulted in the issuance of a notice under paragraph (1) shall be deemed to be terminated and the provisions of paragraphs (1) and (2) shall no longer apply. However, if as a result of subsequent violations, the operator reestablishes a pattern of violations, paragraphs (1) and (2) shall again be applicable to such operator.

**(4)** The Secretary shall make such rules as he deems necessary to establish criteria for determining when a pattern of violations of mandatory health or safety standards exists.

**30 U.S.C. 876(b) Accident preparedness and response**
**(2) Response and preparedness plan**
**(B) Plan Requirements**
An accident response plan under subparagraph (A) shall--
**(i)** provide for the evacuation of all individuals endangered by an emergency; and
**(ii)** provide for the maintenance of individuals trapped underground in the event that miners are not able to evacuate the mine.

**30 C.F.R. 75.1506**
**(**a) Each operator shall provide refuge alternatives and components as follows:

> **(1)** Prefabricated self-contained units, including the structural, breathable air, air monitoring, and harmful gas removal components of the unit, shall be approved under 30 CFR part 7; and

> **(2)** The structural components of units consisting of 15 psi stoppings constructed prior to an event shall be approved by the District Manager, and the breathable air, air monitoring, and harmful gas removal components of these units shall be approved under 30 CFR part 7.

**(3)** Prefabricated refuge alternative structures that states have approved and those that MSHA has accepted in approved Emergency Response Plans (ERPs) that are in service prior to March 2, 2009 are permitted until December 31, 2018, or until replaced, whichever comes first. Breathable air, air-monitoring, and harmful gas removal components of either a prefabricated self-contained unit or a unit consisting of 15 psi stoppings constructed prior to an event in a secure space and an isolated atmosphere that states have approved and those that MSHA has accepted in approved ERPs that are in use prior to March 2, 2009 are permitted until December 31, 2013, or until replaced, whichever comes first. Refuge alternatives consisting of materials pre-positioned for miners to deploy in a secure space with an isolated atmosphere that MSHA has accepted in approved ERPs that are in use prior to March 2, 2009 are permitted until December 31, 2010, or until replaced, whichever comes first.

**(b)** Except as permitted under paragraph (a)(3) of this section, each operator shall provide refuge alternatives with sufficient capacity to accommodate all persons working underground.

**(1)** Refuge alternatives shall provide at least 15 square feet of floor space per person and 30 to 60 cubic feet of volume per person according to the following chart. The airlock can be included in the space and volume if waste is disposed outside the refuge alternative.

| Mining height (inches) (cubic feet) per person* | Unrestricted volume |
|---|---|
| 36 or less | 30 |
| >36-≤42 | 37.5 |
| >42-≤48 | 45 |
| >48-≤54 | 52.5 |
| >54 | 60 |

**(2)** Refuge alternatives for working sections shall accommodate the maximum number of persons that can be expected on or near the section at any time.

g

**(3)** Each refuge alternative for outby areas shall accommodate persons reasonably expected to use it.

**(c)** Refuge alternatives shall be provided at the following locations:

**(1)** Within 1,000 feet from the nearest working face and from locations where mechanized mining equipment is being installed or removed except that for underground anthracite coal mines that have no electrical face equipment, refuge alternatives shall be provided if the nearest working face is greater than 2,000 feet from the surface.

**(2)** Spaced within one-hour travel distances in outby areas where persons work such that persons in outby areas are never more than a 30–minute travel distance from a refuge alternative or safe exit. However, the operator may request and the District Manager may approve a different location in the ERP. The operator's request shall be based on an assessment of the risk to persons in outby areas, considering the following factors: proximity to seals; proximity to potential fire or ignition sources; conditions in the outby areas; location of stored SCSRs; and proximity to the most direct, safe, and practical route to an intake escapeway.

**(d)** Roof and rib support for refuge alternative locations shall be specified in the mine's roof control plan.

**(e)** The operator shall protect the refuge alternative and contents from damage during transportation, installation, and storage.

**(f)** A refuge alternative shall be removed from service if examination reveals damage that interferes with the functioning of the refuge alternative or any component.

**(1)** If a refuge alternative is removed from service, the operator shall withdraw all persons from the area serviced by the refuge alternative, except those persons referred to in § 104(c) of the Mine Act.

h

**(2)** Refuge alternative components removed from service shall be replaced or be repaired for return to service in accordance with the manufacturer's specifications.

**(g)** At all times, the site and area around the refuge alternative shall be kept clear of machinery, materials, and obstructions that could interfere with the deployment or use of the refuge alternative.

**(h)** Each refuge alternative shall be conspicuously identified with a sign or marker as follows:

**(1)** A sign or marker made of a reflective material with the word "REFUGE" shall be posted conspicuously at each refuge alternative.

**(2)** Directional signs made of a reflective material shall be posted leading to each refuge alternative location.

**(i)** During use of the refuge alternative, the atmosphere within the refuge alternative shall be monitored. Changes or adjustments shall be made to reduce the concentration of methane to less than 1 percent; to reduce the concentration of carbon dioxide to 1 percent or less and excursions not exceeding 2.5 percent; and to reduce the concentration of carbon monoxide to 25 ppm or less. Oxygen shall be maintained at 18.5 to 23 percent.

**(j)** Refuge alternatives shall contain a fire extinguisher that—

**(1)** Meets the requirements for portable fire extinguishers used in underground coal mines under this part;

**(2)** Is appropriate for extinguishing fires involving the chemicals used for harmful gas removal; and

i

**(3)** Uses a low-toxicity extinguishing agent that does not produce a hazardous by-product when activated.

**30 C.F.R. 75.1507**

**(a)** The Emergency Response Plan (ERP) shall include the following for each refuge alternative and component:

**(1)** The types of refuge alternatives used in the mine, i.e., a prefabricated self-contained unit or a unit consisting of 15 psi stoppings constructed prior to an event in a secure space and an isolated atmosphere.

**(2)** Procedures or methods for maintaining approved refuge alternatives and components.

**(3)** The rated capacity of each refuge alternative, the number of persons expected to use each refuge alternative, and the duration of breathable air provided per person by the approved breathable air component of each refuge alternative.

**(4)** The methods for providing breathable air with sufficient detail of the component's capability to provide breathable air over the duration stated in the approval.

**(5)** The methods for providing ready backup oxygen controls and regulators.

**(6)** The methods for providing an airlock and for providing breathable air in the airlock, except where adequate positive pressure is maintained.

**(7)** The methods for providing sanitation facilities.

**(8)** The methods for harmful gas removal, if necessary.

**(9)** The methods for monitoring gas concentrations, including charging and calibration of equipment.

j

**(10)** The method for providing lighting sufficient for persons to perform tasks.

**(11)** Suitable locations for the refuge alternatives and an affirmative statement that the locations are—

**(i)** Not within direct line of sight of the working face; and

**(ii)** Where feasible, not placed in areas directly across from, nor closer than 500 feet radially from, belt drives, take-ups, transfer points, air compressors, explosive magazines, seals, entrances to abandoned areas, and fuel, oil, or other flammable or combustible material storage. However, the operator may request and the District Manager may approve an alternative location in the ERP if mining involves two-entry systems or yield pillars in a longwall that would prohibit locating the refuge alternative out of direct line of sight of the working face.

**(12)** The maximum mine air temperature at each of the locations where refuge alternatives are to be placed.

**(b)** For a refuge alternative consisting of 15 psi stoppings constructed prior to an event in a secure space and an isolated atmosphere, the ERP shall specify that—

**(1)** The breathable air components shall be approved by MSHA; and

**(2)** The refuge alternative can withstand exposure to a flash fire of 300 degrees Fahrenheit (°F) for 3 seconds and a pressure wave of 15 pounds per square inch (psi) overpressure for 0.2 seconds.

**(c)** If the refuge alternative sustains persons for only 48 hours, the ERP shall detail advanced arrangements that have been made to assure that persons who cannot be rescued within 48 hours will receive additional supplies to sustain them until rescue. Advance arrangements shall include the following:

**(1)** Pre-surveyed areas for refuge alternatives with closure errors of less than 20,000:1.

k

**(2)** An analysis to demonstrate that the surface terrain, the strata, the capabilities of the drill rig, and all other factors that could affect drilling are such that a hole sufficient to provide required supplies and materials reliably can be promptly drilled within 48 hours of an accident at a mine.

**(3)** Permissions to cross properties, build roads, and construct drill sites.

**(4)** Arrangement with a drilling contractor or other supplier of drilling services to provide a suitable drilling rig, personnel and support so that a hole can be completed to the refuge alternative within 48 hours.

**(5)** Capability to promptly transport a drill rig to a pre-surveyed location such that a drilled hole would be completed and located near a refuge alternative structure within 48 hours of an accident at a mine.

**(6)** The specifications of pipes, air lines, and approved fans or approved compressors that will be used.

**(7)** A method for assuring that within 48 hours, breathable air shall be provided.

**(8)** A method for assuring the immediate availability of a backup source for supplying breathable air and a backup power source for surface installations.

**(d)** The ERP shall specify that the refuge alternative is stocked with the following:

**(1)** A minimum of 2,000 calories of food and 2.25 quarts of potable water per person per day in approved containers sufficient to sustain the maximum number of persons reasonably expected to use the refuge alternative for at least 96 hours, or for 48 hours if advance arrangements are made under paragraph (c) of this section;

1

**(2)** A manual that contains sufficient detail for each refuge alternative or component addressing in-mine transportation, operation, and maintenance of the unit;

**(3)** Sufficient quantities of materials and tools to repair components; and

**(4)** First aid supplies.